**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert A. LEEDS, Defendant-
Appellant.**

**No. 74–1050.**

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 9, 1974.

Decided Nov. 15, 1974.

William W. Deaton, Albuquerque, N. M., for defendant-appellant.

Harris L. Hartz, Asst. U. S. Atty., Albuquerque, N. M. (Victor R. Ortega, U. S. Atty., on the brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, and HOLLOWAY and DOYLE, Circuit Judges.

LEWIS, Chief Judge.

Robert Leeds appeals from the judgment on his jury trial conviction under 18 U.S.C. § 1153, robbery perpetrated by an Indian in Indian country. He challenges the methods by which Bureau of Indian Affairs investigators and tribal police cooperated in the investigation of the incident from which the robbery charge stemmed. This coordinated investigation, Leeds argues, had the effect of placing him twice in jeopardy in violation of the fifth amendment and was part of a "working arrangement" designed to deny his right to prompt arraignment before a federal magistrate. We conclude that Leeds' arguments are without merit and we affirm.

Late on the evening of March 3, 1973, a man identified as Leeds entered the home of Roy Day located on the Laguna Indian Reservation near Albuquerque, New Mexico, and at knife point stole Mr. Day's wallet and the keys to his truck. The robber forced Day's seventeen-year-old son Kenneth to accompany him in the truck away from the Day residence. Mr. Day called for help. The first to arrive at the Day residence were Officers Lente and Paddock of the Bureau of Indian Affairs; they were followed by Officers Romero and Gooday of the Laguna Tribal Police. After Day explained what had happened, the tribal and BIA officers split up in an attempt to locate the boy and the truck. About half an hour later, Romero and Gooday found appellant Leeds and the truck in the parking lot of a bar in the vicinity. It was later discovered that Leeds had left Kenneth Day unharmed on the road four miles from the Day residence. Shortly after BIA Officers Lente and Paddock arrived in the tavern parking lot, Officer Romero drove Leeds back to the Day residence for identification. En route, Leeds apologized to the tribal officers for the incident at the Day home and admitted that he had also vandalized the Catholic church at nearby Seama, New Mexico, earlier that evening. Officer Romero testified that Leeds appeared at the time to have been drinking. When they arrived at the Day residence, Officer Romero formally arrested Leeds, charging him with disorderly conduct in violation of the Laguna Tribal Code.[1] Leeds pleaded guilty and was sentenced to 30 days in jail.

After Officer Romero had taken Leeds in custody, BIA Officers Lente and Paddock interviewed members of the Day family and then contacted their superior officer for further instructions. On the morning after the incident at the Day residence, a BIA investigator interviewed Leeds in the jail at Los Lunas, New Mexico, and obtained a confession

---

1. The pertinent provision of the Tribal Code is as follows:

Any Indian who shall engage in fighting in a public place, disturb or annoy any public or religious assembly, or appear in a public or private place in an intoxicated or disorderly condition, or who shall engage in any other act of public indecency or immorality, shall be deemed guilty of disorderly conduct and upon conviction thereof shall be sentenced to labor or confinement for a period not to exceed 60 days.

See also Code of Indian Tribal Offenses: Disorderly Conduct, 25 CFR § 11.49.

to the robbery. On May 24, 1973, a federal grand jury returned the indictment upon which Leeds was tried.

■■ Leeds first argues that prosecution on the federal robbery charge placed him twice in jeopardy, his conviction under the tribal code having stemmed from the same set of facts as the federal charge, that is, the March 3 incident at the Day residence. We leave aside the question whether an Indian tribe is a sovereign "separate" from the United States under the rule of Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435, because we conclude that, in any event, the acts of the appellant underlying tribal and federal charges differ sufficiently to preclude the application of the double jeopardy clause. Officer Romero, who arrested Leeds on the tribal charge, testified that Leeds was arrested and jailed for his intoxicated condition and for his having admittedly vandalized the Seama church. Although Officer Romero encountered Leeds in connection with his investigation of the robbery, we discern no reason to doubt that he charged Leeds with disorderly conduct based upon the other misbehavior; Romero apparently preferred to leave Leeds's felony prosecution in the hands of federal authorities. Even if the tribal charge of disorderly conduct surfaced from Leeds's conduct at the Day residence the fifth amendment's double jeopardy clause still would not bar federal prosecution for robbery since the elements of the two offenses—disorderly conduct and robbery—are different. Under any applicable test the tribal disorderly conduct charge, whether or not resting on Leeds's conduct at the Day residence, was a legal stranger to the federal robbery charge. Prosecution on the latter is therefore not barred by the fifth amendment. ·

Leeds next argues that "cooperation" between tribal and BIA officers resulted in Leeds's incarceration on the minor charge of disorderly conduct and was part of a "working arrangement" designed to enable BIA authorities to circumvent Rule 5(a), Federal Rules of Criminal Procedure, which requires that criminal suspects under federal arrest be brought before a magistrate "without unnecessary delay". In order to correct what he characterizes as an injustice participated in by federal officers, Leeds urges this court to reverse the judgment of conviction in the exercise of its supervisory powers over the administration of criminal justice.

■ We note preliminarily what counsel for the appellant seems to assume, that Rule 5(a) does not apply to persons in tribal custody pursuant to charges brought in the tribal court, just as the rule does not apply to persons held in state custody. See Rule 54(a), Fed. R.Crim.P.; 25 CFR § 11.17. Accordingly we believe that the federal law developed to safeguard the rights of persons under federal investigation while in state custody is applicable to suspects, like Leeds, who are held in tribal custody.[2] Thus where federal authorities are alleged to have conspired with state or tribal police in the denial of an arrested suspect's right to prompt arraignment, the latter must prove actual collaboration toward that end between federal authorities and their state or tribal counterparts. "A bare suspicion that there was cooperation between the two agencies designed to deny fundamental rights is not sufficient, and will not justify reversing the trial judge who had

2. In United States v. Keeble, 8 Cir., 459 F.2d 757, rev'd on other grounds, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844, the defendant was jailed initially on tribal charges and, while in jail, made incriminating statements relating to a federal offense in response to interrogation by federal officers. The court observed that since the arresting officer was both "an employee of the Bureau of Indian Affairs and a police officer at the reservation," the defendant was at all times in *federal* custody and Rule 5(a) applied. In the present case, by contrast, the arresting officer was employed by, and his authority derived solely from, the tribe. See 25 CFR § 11.-304. Absent some "working arrangement" between tribal and federal investigators—evidence of which we are unable to find—Leeds's incarceration for the tribal code violation was manifestly tribal in character.

the benefit of hearing the testimony and observing the demeanor of the witnesses." United States v. Ireland, 10 Cir., 456 F.2d 74, 77.

The evidence in the present case shows that BIA authorities forbore from arresting Leeds not because of any "working arrangement" with tribal officers designed to circumvent Leeds's right to prompt arraignment, but because of a local BIA policy requiring BIA investigators to check with their supervisors, whenever possible, before arresting on serious federal charges. Leeds's incarceration on tribal charges here made such delay possible. Although BIA officers participated in the attempt to locate Leeds and the Day boy, tribal officers apprehended and arrested Leeds. The federal officers, significantly, did not influence or participate in the decision to charge Leeds with disorderly conduct. In short, we are unable to find any evidence of a working arrangement in derogation of Leeds's rights.

Affirmed.