**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John DOE, a Juvenile, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellant,**

v.

**John DOE, a Juvenile, Defendant–Appellee.**

**Nos. 95–10455, 95–10561.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 28, 1997.

Decided Aug. 25, 1998.

---

Gerald A. Williams, Assistant Federal Public Defender, Phoenix, Arizona, for defendant-appellant.

Vincent Q. Kirby, Georgia B. Ellexson, Assistant United States Attorney's, Phoenix, Arizona, for plaintiff-appellee.

Before: HUG, Chief Circuit Judge; FLETCHER, PREGERSON, REINHARDT, HALL, BRUNETTI, THOMPSON, O'SCANNLAIN, THOMAS G. NELSON, HAWKINS, and TASHIMA, Circuit Judges.

BRUNETTI, Circuit Judge:

John Doe petitioned for rehearing from the March 27, 1997, Ninth Circuit reversal of the district court's order to suppress statements Doe made, while a juvenile, after waiving his *Miranda* rights but without parental notification. We have taken this case en banc to reconsider two issues. First, whether failure to notify a juvenile's parent of his arrest is a constitutional due process violation that requires suppression of the juvenile's statements made in the absence of parental notification and without the parent's presence. Second, whether § 5033 of the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. § 5033 et seq. ("JJA"), applies where a juvenile is questioned by federal agents while he is held in tribal custody pursuant to tribal charges.

We hold that Doe's *Miranda* waiver was knowing, intelligent, and voluntary. Additionally, we hold that lack of parental notification is not, per se, a due process violation voiding the *Miranda* waiver. Finally, we vacate the district court's decision that 18 U.S.C. § 5033 applies on these facts and

remand for further factual determination as to the relationship between the federal and tribal police.

## I.

### Facts and Proceedings Below

In 1991, when all relevant events took place, John Doe was 17 years old. He lived on the Navajo Indian Reservation in Chinle, Arizona.

On April 26, 1991, Doe met his friend, John Yellowman, and began a drinking binge that would continue all day. They drank wine most of the morning. When the wine was gone, they met two other young men and drank beer throughout the afternoon. They then proceeded to another juvenile's home and smoked marijuana and drank "ocean," a mixture of Lysol or hairspray and water. When the "ocean" was gone, they left the home in search of additional alcohol.

At this point, late in the evening on April 26th, John Yellowman, Wally Hallwood, another 17–year–old Navajo juvenile, and John Doe entered a residential trailer on the reservation. There were four occupants in the trailer. Upon entry, a fight broke out. Two of the occupants were fatally stabbed, and a third seriously injured. Doe and his accomplices then left the trailer.

After this incident, Yellowman and Doe went to a dance at the Chinle Recreation Center in the Sunnyside Housing Development. There they met two men. Doe asked them for cigarettes. A fight then broke out resulting in the nonfatal stabbing of the two men.

During the early morning hours of April 27, 1991, Navajo Tribal Police officers responded to a report of an accident/injury at a trailer located in Chinle within the Navajo Indian Reservation. Upon arrival, the police discovered three Indian males all suffering from stab wounds. Two victims, later identified as Bobby Marks and Leon Notah, were transported to the Chinle Hospital and pronounced dead on arrival. A third victim, George Taylor, was also transported to the Chinle Hospital suffering from wounds which were potentially life threatening.

While investigating these homicides, tribal officers received reports of another stabbing at the Sunnyside Housing Development. There were two victims at the Sunnyside Housing Development, Robert Woods and Randy Jake. Both men were transported to the Chinle Hospital and treated for stab wounds prior to their release.

The three surviving victims provided a description of their assailants to the tribal officers. Shortly thereafter, tribal police arrested Yellowman and Doe. At the time of arrest, both suspects were hiding near the second stabbing location and had blood on their clothing.

At approximately 1:30 a.m. on April 27th, as the tribal investigation continued, FBI Special Agent Stan Burke was contacted concerning the stabbings. At approximately 4:00 a.m. he arrived in Chinle at the scene of the first incident and was briefed by tribal police.

Agent Burke returned to the Chinle Police Department and interviewed Doe at approximately 5:00 a.m. The interview was conducted in the presence of Franklin Tsosie, Criminal Investigator with the Navajo Department of Law Enforcement. Agent Burke introduced himself to Doe and advised him that he was investigating a stabbing-murder that had occurred in the nearby trailer. Agent Burke did not place Doe under arrest for any federal offense and Doe was not in federal custody. Doe was, however, being held pursuant to tribal charges of aggravated assault. Agent Burke did not inquire into Doe's age and was not aware that Doe was a juvenile until the end of the interview.

Prior to beginning the interview, Agent Burke reviewed with Doe his *Miranda* rights, using an FBI Advice of Rights Form. He asked Doe if he understood his rights. Burke specifically asked Doe if he knew what "coercion" meant. Doe stated that he did not and Agent Burke provided an explanation. Doe then stated that he understood his rights, signed the Advice of Rights Form, and agreed to speak with Agent Burke. The responses that followed, including Doe's confession to the stabbings, are the subject of this appeal.

On December 22, 1994, Doe was federally charged in an information with Premeditated First Degree Murder, Counts 1 and 3; Felony First Degree Murder, Counts 2 and 4; Residential Burglary, Count 5; and Assault Resulting in Serious Bodily Injury, Counts 6–8, all occurring on April 27, 1991.

## II.

### Due Process Protections.

The Supreme Court has specifically extended the protections of the Due Process Clause to proceedings in which a juvenile may be adjudged delinquent. *In re Gault,* 387 U.S. 1, 31–55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The Court admonished law enforcement and courts to take care to ensure that a juvenile's admissions were voluntary and not the "product of ignorance of rights or of adolescent fantasy, fright or despair." *Id.* at 55, 87 S.Ct. 1428. The Court in *Gault,* however, declined to establish specific procedural requirements for the investigatory phase stating "we are not here concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process." *Id.* at 13, 87 S.Ct. 1428. Thus, beyond the Court's general admonition, *Gault* is of little specific guidance in a case where the juvenile's statement is taken during the investigation and prior to any proceedings. Accordingly, we review Doe's *Miranda* waiver for overall due process compliance.

The test for reviewing a juvenile's waiver of rights is identical to that of an adult's and is based on the "totality of the circumstances." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). There is no due process requirement that the juvenile's parents be notified for the waiver to be valid, and we decline to create one. Rather, the lack of parental notification is one factor to consider in the totality of the circumstances. *See Stone v. Farley,* 86 F.3d 712, 717 (7th Cir.1996); *United States v. M.I.M.,* 932 F.2d 1016, 1018 (1st Cir.1991); *United States v. White Bear,* 668 F.2d 409, 412 (8th Cir.1982); *Miller v. Maryland,* 577 F.2d 1158, 1159 (4th Cir.1978); *see also Harris v. Wright,* 93 F.3d 581, 586 (9th Cir.1996); *United States v. Doe,* 701 F.2d 819, 822 (9th Cir.1983).

■ For a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." *United States v. Bautista-Avila*, 6 F.3d 1360, 1365 (9th Cir.1993) (quoting *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir.1986)).

■ A waiver is voluntary if, under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement. *United States v. Pinion*, 800 F.2d 976, 980 (9th Cir.1986). A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

## A. Standard of Review

■ We review a district court's rulings on *Miranda* waiver according to a two-step standard of review. The inquiry as to knowing and intelligent waiver is essentially a question of fact. Whether a defendant's waiver was knowing and intelligent is reviewed for clear error. *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir.1991) (en banc). On the other hand, an assessment of the voluntariness of a *Miranda* waiver, like a probable cause or reasonable suspicion determination, is a mixed question of law and fact that we review de novo. *Id.* at 415–16. Voluntariness turns on broad legal principles, and without de novo review, we would be unable to properly define these legal principles and maintain a unitary system of law. Indeed, one of the questions presented by this case-whether due process requires parental notification before a juvenile can voluntarily waive his *Miranda* rights-offers a paradigmatic example of the importance of de novo review to defining and clarifying legal principles.

■ We do, however, as with all underlying factual findings, defer to the district court's factual findings unless they are clearly erroneous. *See United States v. Cazares*, 121 F.3d 1241, 1245–46 (9th Cir.1997). Clearly erroneous review is more deferential. We accept the lower court's findings of fact unless upon review we are left with the definite and firm conviction that a mistake has been committed. Hence, "[i]f the [district court's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Phoenix Eng'g and Supply Inc. v. Universal Elec. Co.*, 104 F.3d 1137, 1141 (9th Cir.1997) (internal quotation omitted).

## B. Doe's *Miranda* Waiver

The district court granted Doe's motion to suppress his statement to Agent Burke based upon a mistaken assumption that § 5033 applied to this case. *See* Part III, *infra.* In so doing, the court ruled that since the parental notification requirement of § 5033 was not complied with, Doe's statement must be suppressed. Because the court's suppression analysis hinges on application of § 5033 and not upon constitutional due process, the court recited virtually no factual findings describing the circumstances surrounding Doe's *Miranda* waiver. The court, however, stated that "I cannot conclude on the entire record that the waiver was knowing and intelligent and voluntary relinquishment of the known right; therefore the motion to suppress the defendant's statements is granted." The district court's decision is attached as an "Appendix" to this opinion.

We review this ruling according to the two-step standard of review discussed above: de novo as to voluntariness and clear error as to knowing and intelligent. The lack of factual findings recited by the district court undermines our confidence in the court's ruling. As to voluntariness, the district court did make oral findings of fact that "[t]here is no issue concerning the circumstances surrounding the taking of the statement by virtue of cramped quarters or a situation wherein the defendant's will was overborne by the interrogation of Special Agent Burke with the

presence of Franklin Tsosie." No additional findings were made as to voluntariness. Thus, the court's ultimate ruling that on the entire record the waiver was involuntary is inconsistent with the facts.

■ Review of the totality of circumstances, including past history, education, and physical condition, and the circumstances surrounding the actual statement, makes it clear that Doe's waiver was voluntary. The record reveals that at the time of the confession, Doe did not appear to be intoxicated. There was no slurred speech. He did not ask for questions to be repeated. He never requested to leave the room for food, water, or a restroom. Doe was not handcuffed. He did not have trouble understanding the questions. His statements were coherent and not rambling. He appeared to have a grasp of the facts. The officers made no threats or promises of any kind, and there is no indication that the questioning was oppressive in any way. While the interrogation was conducted at 5:00 a.m. on the morning following the stabbings, and a tribal officer testified that Doe had "ocean" [1] on his breath when he had been taken into custody several hours earlier, the timing of the interrogation was dictated by the fact that officers had only one witness to the stabbings, and Doe showed no signs of intoxication that would undermine the voluntariness of his confession. Finally, while the lack of parental notification is one of the factors to be considered in the totality of the circumstances, Doe never asked that his parents be notified or that they be present, and Doe's actions and demeanor during the Burke interview reveal that his confession was the product of a free and deliberate choice. Accordingly, after de novo review of the record deferring to the district court's factual findings, we cannot say that Doe's waiver was not voluntary. We reverse the district court on this determination.[2]

As to the district court's determination that Doe's waiver was not knowingly and intelligently given, we must defer to this ruling unless we are convinced it is clearly erroneous. Here, the presumption of correctness is rebutted by the evidence.

■ A waiver is knowing and intelligent if, under the totality of circumstances, it is made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran,* 475 U.S. at 421, 106 S.Ct. 1135. We hold today that lack of parental notification is but one of the factors to be considered in the totality of circumstances. Nonetheless, there are no facts indicating that Doe did not know the nature and the consequences of the right being abandoned. Doe was informed of his rights. He was asked if he understood his rights and he immediately said that he did. Doe did not ask that any of the rights be clarified. In fact, Agent Burke explicitly asked Doe if he understood what "coercion" meant when Doe had trouble pronouncing the word. Doe's actions during the Burke interview and his demeanor indicate that he knew what he was doing and that he was not in need of his parents' advice or counsel. Moreover, Doe never asked that his parents be notified or asked that they be present. Thus, we find that Doe knowingly and intelligently waived his rights.

In sum, the record discloses no evidence to suggest that Doe's statements were "the product of ignorance of rights or of adolescent fantasy, fright or despair." *Gault,* 387 U.S. at 55, 87 S.Ct. 1428. In the present case, as in *Fare,* "the [officers] took care to inform [Doe] of his rights and to ensure that he understood them. The officers did not intimidate or threaten [Doe] in any way. Their questioning was restrained and free from the abuses that so concerned the Court

---

1. The tribal officer testified that "ocean" is a mixture of water and hair spray with effects similar to alcohol.

2. The dissent, relying on conflicting testimony of Tribal Officer Tsosie and FBI Agent Burke as to whether or not Doe was informed or advised that he could have his parents present at the interview, concludes that the district court could properly question the credibility of the officers, especially doubting their emphatic testimony re-

garding Doe's condition, which was not in conflict. The district court made no credibility findings and did not resolve the inconsistencies between the testimony of Tsosie and Burke regarding parental notification. In fact, the only specific finding made by the district court was that there was no issue concerning the circumstances surrounding the taking of Doe's statement by virtue of the cramped quarters or a situation wherein the defendant's will was overborne by Burke's interrogation.

in *Miranda.*" 442 U.S. at 727, 99 S.Ct. 2560. Under the totality of the circumstances, Doe's waiver was voluntary, knowing, and intelligent.

## III.

### Application of 18 U.S.C. § 5033

Title 18 U.S.C. § 5033 provides:

Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensive to a juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense.

The juvenile shall be taken before a magistrate forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate.

18 U.S.C. § 5033. The district court stated that 18 U.S.C § 5033 applied to Doe because, although he was being held by tribal authorities on tribal charges, "sooner or later it was going to be determined that he was a juvenile and would be then, subject to federal prosecution, entitled to the protections of 18 U.S.C. § 503.1(f)(c), [sic] which are the juvenile delinquency statutory provisions. Those provisions provide clearly that a juvenile's parents are to be notified." Because Doe's parents had not been notified, the district court suppressed Doe's confession.

 The district court's interpretation of the statute conflicts with the plain language of the statute. The statute specifically states that it applies when a juvenile is taken into "custody" by an "arresting officer." As our three-judge panel in this case previously stated, use of the terms "custody" and "arresting officer" implies that a federal arrest on a federal charge is a necessary prerequisite to the statute's application. *See United States*

*v. Doe,* 109 F.3d 626, 629–30 (9th Cir.1997). We agree.

This reading of § 5033 is supported by the section's placement of the notification duty on an "arresting officer" and by the section's additional requirement that the juvenile be taken before a magistrate forthwith; unless the juvenile were charged with a federal offense, this language and the presentment requirement would make little sense. This reading of § 5033 is also supported by the section's rather sparse legislative history. The Senate Report on the 1974 amendments to the Federal Juvenile Delinquency Act suggests that the amendments were intended "to guarantee certain basic procedural and constitutional protections to juveniles" as required by *Gault.* S.Rep. No. 93–1011, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 5283, 5312. The Senate Report notes that § 5033 requires that "[n]otice of the apprehension, nature of the alleged offense, and rights of the juvenile … be given to parents, guardians and custodians." *Id.* at 5320. This requirement tracks perfectly *Gault* 's holding that due process requires parental notice prior to judicial proceedings. Nothing in the Senate Report evinces an intent to extend *Gault* 's due process requirement to the pre-judicial stages of the juvenile process. *See United States v. Indian Boy X,* 565 F.2d 585, 590–91 (9th Cir.1977), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978).[3]

The Supreme Court's holding in *United States v. Alvarez–Sanchez,* 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) is also instructive. In *Alvarez–Sanchez,* the Court examined 18 U.S.C. § 3501(c), which provides that, in any federal criminal prosecution, "a confession made … by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law enforcement officer … shall not be inadmissible solely because of delay in bringing such person before a magistrate." The Supreme Court held that a person ques-

---

**3.** The predecessor statute to § 5033, 18 U.S.C. § 5035, referred to the "arrest" of a juvenile for an alleged violation of any law of the United States. *Indian Boy X,* 565 F.2d at 589; *see also United States v. DeMarce,* 513 F.2d 755, 757–58 (8th Cir.1975) (holding that § 5035 required a

federal arrest on federal charges). Substitution of the term "custody" for "arrest" was necessary to comply with *Gault* 's recognition of a juvenile's right against self-incrimination but did not supplant arrest on federal charges as the trigger for parental notification.

tioned by a federal officer while being held on state charges was outside the protection afforded by 18 U.S.C. § 3501. *Id.* at 358–59, 114 S.Ct. 1599. Hinging its analysis on the word "delay," the Supreme Court held that there could not be a delay without a previous duty, and the duty to bring someone before a federal magistrate does not arise until there has been a federal arrest on federal charges. *Id.* at 358, 114 S.Ct. 1599.

We follow the lead of the Supreme Court in *Alvarez–Sanchez* and interpret 18 U.S.C. § 5033 accordingly. This interpretation is appropriate because 18 U.S.C. § 5033, like 18 U.S.C. § 3501, addresses someone being taken into "custody" by an "arresting officer." Moreover, § 5033, similar to § 3501, also mandates that the arrested juvenile be taken "before a magistrate forthwith" and that the juvenile be detained for "no longer than a reasonable period of time before being brought before a magistrate." 18 U.S.C. § 5033.

This approach is followed by at least one other circuit. *United States v. Juvenile Male,* 74 F.3d 526, 530 (4th Cir.1996). In *Juvenile Male,* the Fourth Circuit was faced with a motion to dismiss delinquency charges against a juvenile based on a speedy trial violation. In that case, the juvenile was taken into administrative detention pending deportation proceedings by the Immigration and Naturalization Service ("INS") on April 5, 1994. The juvenile was charged with a federal criminal complaint on June 3, 1994. That same date the INS dropped deportation proceedings, released the juvenile to the custody of the United States Marshal, and he was arraigned before a magistrate judge. The juvenile complained that his parents were not "immediately notified," and he was not brought before a magistrate judge "forthwith" after being taken into custody of the INS on April 5, 1994, as required by 18 U.S.C. § 5033. *Id.* at 530. The Fourth Circuit held that "the provisions relied upon by the juveniles are not invoked until a juvenile is charged by information with an act of delinquency, as required pursuant to 18 U.S.C. § 5031 and 5032." *Id.* at 527.

Accordingly, under the terms of the statute and the guidance of *Alvarez–Sanchez,* 18 U.S.C. § 5033 did not apply when Doe was questioned by Agent Burke. Doe had been arrested and was being held on tribal charges of aggravated assault only. There is no doubt that he was in custody, but that custody was tribal and therefore did not trigger the protections of § 5033.

Other circuits have found that certain unique circumstances may satisfy federal custody. Doe did not brief this specific issue in his petition for rehearing, before the district court, or before our three-judge panel. In his Petition for Rehearing and Suggestion for Rehearing En Banc, however, he did allege collaboration between the federal and tribal authorities. We allowed en banc oral argument on this legal issue and it is addressed by the court today.

The Eighth Circuit has held that a juvenile is in federal custody for purposes of § 5033 where the juvenile is arrested by Bureau of Indian Affairs ("BIA") officers, even if the juvenile is not formally charged with a crime, from the time federal agents made arrests "on a probable cause (to believe) that state and federal offenses have been committed." *United States v. DeMarce,* 513 F.2d 755, 757 (8th Cir.1975). The district court found that the youths were arrested by BIA officers, and the Eighth Circuit ruled that the arrest by the BIA officers was "federal arrest" for purposes of 18 U.S.C. § 5035 (now § 5033). 513 F.2d at 757. The juveniles were subsequently held in state jail for 80 hours prior to being taken to a federal magistrate and charged under federal law. Statements made during the 80–hour delay were suppressed because of law enforcement's failure to comply with the Juvenile Delinquency Act's mandate that juveniles in federal custody be presented to a magistrate forthwith. *Id. DeMarce* can be distinguished from the present case because, in *DeMarce,* state law enforcement officers and officers of the BIA cooperated in chasing and apprehending the juveniles, and the BIA officer's arrest was found to be a federal arrest. The district court here found that the only arrest made was by tribal officers and that Doe was being held on tribal charges.

Similarly distinguishable is *U.S. v. Jackson,* 712 F.2d 1283 (8th Cir.1983), where the arresting officers were connected with the BIA and were not just tribal police. The

court held that Jackson was in federal custody from the time he was arrested by the BIA-connected officers. *Id.* at 1286. Consequently, his confession given after the arrest was suppressed because it is in violation of his right under *Mallory v. U.S.*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and Rule 5(a) of the Federal Rules of Criminal Procedure for failure to be taken before a U.S. Magistrate without unnecessary delay. There is no dispute that Doe was arrested by the Navajo Police clearly distinguishing this case from *Jackson.*

■ However, the Tenth Circuit has deemed tribal custody to be federal custody where there is a "working arrangement" between the federal and tribal officers to deprive a suspect of federal procedural rights. *United States v. Leeds*, 505 F.2d 161, 163 (10th Cir.1974). Leeds was convicted after a jury trial under 18 U.S.C. § 1153 for robbery perpetrated by an Indian in Indian country. Leeds was arrested by tribal officers and charged with a tribal offense. While in tribal custody, federal officers obtained a confession to a robbery and Leeds was indicted by a federal grand jury. He challenged this conviction claiming that "cooperation" between tribal and BIA officers resulted in Leed's incarceration on the minor charge of disorderly conduct and was part of a "working arrangement" designed to deny his right to prompt arraignment before a federal magistrate in violation of Rule 5(a) of the Federal Rules of Criminal Procedure. Though the court found no "working arrangement," it went on to state that a "working arrangement" would implicate federal procedural protections. *Id.* at 163–64.

The *Leeds* court set the parameters of a "working arrangement" as follows:

> where federal authorities are alleged to have conspired with state or tribal police in the denial of an arrested suspect's [federal

procedural] right[s] ... the latter must prove actual collaboration toward that end between federal authorities and their state or tribal counterparts. A bare suspicion that there was cooperation between the two agencies designed to deny fundamental rights is not sufficient....

*Id.* at 163 (internal quotations omitted).[4]

■ DeMarce and *Jackson*[5] are not applicable here because they involve federal arrests; however, the reasoning behind the Tenth Circuit's *Leeds* "working arrangement" theory is compelling. While it is unclear whether such an arrangement existed in this case, we would find federal custody if the facts proved that tribal and federal police actually collaborated to deny Doe his federal procedural rights. The bare suspicion of cooperation between the two is not, however, sufficient. Accordingly, we remand for further fact finding regarding the relationship between the federal agency and the tribal police and a determination of whether there was an actual collaboration to deny Doe of his § 5033 rights.[6]

## IV.

### Conclusion

For the reasons stated above, we hold that Doe's *Miranda* waiver was knowing, intelligent, and voluntary. Additionally, we hold that lack of parental notification is not, per se, a due process violation voiding a juvenile's otherwise valid *Miranda* waiver. Finally, we vacate the district court's decision that 18 U.S.C. § 5033 applies on these facts and remand for a further factual determination as to whether there was an actual collaboration between federal and tribal officers to deny Doe's federal procedural rights under § 5033.

VACATED AND REMANDED.

---

**4.** *Leeds* presents a variation on *Anderson v. United States*, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943), which involved an improper collaboration between federal officers and local authorities to avoid *state* procedural laws.

**5.** Even though not applicable, *Jackson* cites favorably to *Leeds*.

**6.** The dissent is centered around the conclusion that Doe was in federal custody and that § 5033

should apply. That conclusion is further based on an assumption that we can take judicial notice of a jurisdictional framework claimed to exist in the District of Arizona which is not described by the district court, but which the dissent states that the district court is taking "as a given." This conclusion, based on an assumption taken as given, has no basis in the facts of this case and is contrary to the holding articulated in *Leeds* which we adopt today.

## APPENDIX

"Before the Court is the defendant's motion to suppress statements based on the notion that the juvenile was not properly advised of his rights as required for-by the law for juvenile defendants.

The issue here essentially revolves around whether or not the defendant's parents should have been called because he was, clearly, by age, a juvenile. The facts reflect that the defendant was placed under arrest by Franklin Tsosie, and so he was in custody at least insofar as tribal custody is concerned.

The interview took place in the Navajo Police Department. There is no issue concerning the circumstances surrounding the taking of the statement by virtue of cramped quarters or a situation wherein the defendant's will was overborne by the interrogation of Special Agent Burke with the presence of Franklin Tsosie, but there is no question that he was not simply free to go. He was not going to go anywhere because he was being held on tribal charges, and sooner or later it was going to be determined that he was a juvenile and would be then, subject to federal prosecution, entitled to the protections of 18 U.S.C. § 503.1(f)(c), which are the juvenile delinquency statutory provisions. Those provisions provide clearly that a juvenile's parents are to be notified immediately.

Now, there's also no question that [Doe] was clearly a suspect in this particular case. This was not simply an effort to examine him with the hopes of finding out more about the events that took place on April 27th of that year.

It's routinely the procedure to, at some stage before the examination proceeds, to get the vital statistics from a witness, and in this case that wasn't done. That wasn't done until after there was an extended statement as to Ronald's participation in these events. If those preliminary questions had been asked, there would be no issue here today because it would have been obvious that Ronald was a juvenile and, therefore, it would be important that the parents be notified so that the juvenile would also have the wisdom of the parents, as well as his own wisdom, in determining whether or not to waive his right to an attorney and to proceed with the examination.

I cannot conclude on the entire record that the waiver was knowing and intelligent and voluntary relinquishment of the known right; therefore, the motion to suppress the defendant's statements is granted."

MICHAEL DALY HAWKINS, Circuit Judge, joined by FLETCHER, PREGERSON, REINHARDT, and TASHIMA, Circuit Judges, dissenting:

In a deft move that would make Joseph Heller proud,[1] the majority tells us that a juvenile suspect, arrested near the scene of a violent murder by a Navajo Tribal Officer and held in custody for questioning by federal agents, merits the protection of neither the laws of the Navajo Nation nor the United States, both of which require parental notification prior to questioning. Tribal law matters not, the majority tells us, because the juvenile was prosecuted in federal, not tribal, court and no violation of federal law occurred because he was in tribal, not federal custody. To avoid this conundrum, the juvenile must engage in the sisyphean task of proving that he was put in this situation as a result of a conspiracy specifically designed and carried out to avoid the requirements of federal law. The result is all the more problematic as it is the government's burden to prove that a statement has been made as the result of a knowing, intelligent, and voluntary waiver of one's rights—a burden the district court has already found the government failed to meet on the facts of this case.

District judges in this circuit hear thousands of cases each year in which they must make factual determinations. In doing so, they weigh evidence and assess the credibility of witnesses. These factual determinations are required in a wide variety of matters—from judging whether probable cause exists for an arrest or search or, as in this

---

**1.** "If you are crazy, they have to take you out of combat, but the catch is you have to ask them, and if you're trying to get out of combat then you can't be crazy." Jacob Brackman, *Catch 22 Ca-* sebook 363 (Frederick Kiley & Walter McDonald, eds., 1973) (reviewing Joseph Heller, *Catch 22* (1961)).

case, whether the government met its burden to prove the knowing, intelligent, and voluntary nature of a *Miranda* waiver. In making the factual judgments that underlie the admissibility of such a statement, district courts are, as they should be, accorded substantial discretion. It is, after all, the district court that sees the witnesses, listens to, and compares the witness accounts. Consistent with the breadth of that discretion, we rarely demand that the district court make detailed fact findings—especially when no party has asked that it be done. We simply look to the record to see if the evidence shows that the district court's determination was not clearly erroneous. *See, e.g., United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir.1986).

Here, the district court did exactly what was required of it. The government sought to use the statement of a seventeen-year-old Navajo with a ninth-grade educational level who had been heavily drinking as well as abusing drugs and other substances over a twelve-hour period. The interview, done in other than his native tongue, took place at 5:00 o'clock in the morning and, despite the requirements of both tribal and federal law, before his parents were notified of his arrest. *See* Navajo Code tit. 9, § 1107 A; 18 U.S.C. § 5033. After hearing both sides on the issues and listening to the somewhat conflicting testimony of the arresting Navajo Tribal Officer and the FBI Special Agent who conducted the interview, the district court concluded "on the whole record that [Doe's] waiver was [not a] knowing and intelligent and voluntary relinquishment of a known right."

A more routine handling of a criminal proceeding in a district whose docket is heavily influenced by major crimes in Indian Country would be hard to find. Yet the majority insists that the district court do it all over again. This time, the majority insists, the defendant must not only prove his statement was involuntary, he must prove the existence of a "conspiracy" between tribal and federal authorities to deprive him of his rights.

There is no question but that Doe's parents were not notified and were not present during his interview. This is not the sole basis for the district court's determination that the government had not met its burden of establishing the admissibility of Doe's

statement. Instead, after hearing testimony from Tribal Officer Tsosie and Agent Burke of the FBI, the district court concluded, "on the whole record," that Doe's waiver was not voluntary, knowing, and intelligent.

The majority pays lip service to our standards of review but then proceeds to sit as a fact-finder. Doe's waiver was voluntary, the majority concludes, because, after a twelve-hour drug and drinking binge and no sleep for an entire night, Doe appeared coherent and lucid to Tsosie and Burke at 5:00 o'clock in the morning. Yet the district court also heard evidence that Doe had consumed the intoxicant, "ocean," just before his arrest, that he appeared under the influence of alcohol as recently as 2:00 a.m., that his eyes were bloodshot, and that he appeared tired. Moreover, due to the conflicting testimonies of Tsosie and Burke, *see infra*, the district court could properly question the credibility of the officers, especially doubting their emphatic testimony regarding Doe's condition.

The majority next recites our deferential clear error standard of review for determining whether a waiver is knowing and intelligent and then finds the district court's conclusion "implausible." The majority concedes, as it must, that parental absence is a factor the district court may consider in determining the admissibility of a statement taken from a juvenile in these circumstances, *see United States v. Indian Boy X*, 565 F.2d 585, 591–92 (9th Cir.1977), but then dismisses it as a non-factor. To the majority, parental notification is relevant only if the juvenile's demeanor indicates he needs his parents' advice or if he asks that his parents be notified. Maj. op. at 1075–76. In enacting 18 U.S.C. § 5033, however, Congress disagreed. Section 5033 reflects a policy decision by Congress that parents of juveniles in federal custody *must* be immediately notified of the arrest and the juvenile's rights. It is not the juvenile's decision to make. This is because a juvenile may need the advice of his parents or guardians who better understand the stakes involved, whether or not the juvenile thinks he needs it. Given the totality of the circumstances—Doe's ninth-grade educational level, lack of criminal history, physical condition, native language of Navajo, and lack

of a parent or attorney being present—the district court's finding that Doe's waiver was not knowing and intelligent seems entirely plausible.

So why *are* we sending this matter back to the district court? Good question. The answer certainly cannot be to gain a more complete record on the condition of Doe or the physical circumstances of his interrogation. The majority apparently wishes more detail in the record about the relationship between tribal and federal authorities.

Doe was in federal custody during his interrogation, and § 5033 should apply. This was an investigation of a murder, as the FBI made clear in the first moments of Doe's interview. Because the murder took place on the Navajo Reservation, only federal authorities had jurisdiction over the crime; neither the tribe nor any state official had the slightest jurisdiction over the crime for which Doe was held for questioning by federal authorities. *See* 18 U.S.C. §§ 1151, 1153. That is why Officer Tsosie took Doe into custody, notified the FBI, and then held him until FBI Agent Burke arrived. That is why Agent Burke conducted the interview and Officer Tsosie simply observed. We could easily take judicial notice of this jurisdictional framework. *See* Fed.R.Evid. 201. Because it is such a routine and commonplace event in a district like Arizona, the district court undoubtedly did the same by simply taking it as a given.

The suggestion that Doe was under "tribal arrest on tribal charges" is suspect at best. Tribal police discovered two violent crime scenes, with two dead bodies and three other seriously injured victims. They found Doe near the second crime scene, covered with blood. Yet the majority suggests that tribal police arrested Doe with the intent of charging him with a tribal misdemeanor. Officer Tsosie never questioned Doe regarding an assault, and no tribal charges were ever filed against Doe in tribal court. Instead, from the beginning, this was a murder investigation—subject to exclusive federal jurisdiction. Moreover, all the possible crimes that Doe could have been charged with—manslaughter, kidnapping, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, burglary, robbery—are governed exclusively by federal law. *See* 18 U.S.C. § 1153(a).

Officer Tsosie acknowledged the close cooperation between tribal and federal authorities when investigating a murder in Indian country. His testimony on this point is definitive: he testified that he held Doe in a squad car at the murder scene and "waited for Agent Burke to arrive." He agreed that it was "routine" for an FBI agent to take over an "investigation for federal prosecution and not for the purposes of a tribal investigation." [2] During the interrogation of Doe, Agent Burke asked all the questions. Officer Tsosie simply signed the waiver form as a witness.

The district court was also faced with glaring inconsistencies between the testimonies of Tsosie and Burke, for example, whether Burke knew Doe was a juvenile before the interrogation began. Officer Tsosie emphatically testified that Agent Burke asked Doe if he was a juvenile and if he wanted his parents present for the interrogation.[3] Agent

2. Q. (Defense counsel): At the time that you arrived at the scene, from the beginning to the end, were you considered the lead investigator on the case?
A. (Tsosie): Up to when Agent Burke arrived.
Q. So when Agent Burke arrived, he actually took over the investigation, is that what your testimony is?
A. Yes.

3. Q. (Defense counsel): Is there a [Navajo] Department of Public Safety policy for interrogating or interviewing juveniles?
A. (Tsosie): Yes.
Q. And what is that policy?
A. If the person wants their parents there, we usually try to get their parents there during the interview.

Q. And you were present during the interviews; is that correct?
A. Yes.
Q. Did anyone ask [Doe] if he wanted his parents present?
A. Yes.
Q. And who was that?
A. Agent Burke.
Q. And are you positive of that?
A. That he asked that question?
Q. Yes.
A. Yes.
. . .
Q. Do you recall what portion of the interview Agent Burke informed or advised [Doe] that he could have his parents present?
A. During the beginning.
. . .

Burke testified that he did not ask Doe's age until after the interrogation or if Doe wanted his parents present. Moreover, Agent Burke stated that, even if he had known that Doe was a juvenile, he would have interrogated Doe without first notifying Doe's parents.[4]

The end result is that the government avoids the requirements and restrictions of both tribal and federal law. If Doe had been tried in tribal court, the statement would be inadmissible. *See* Navajo Trib.Code tit. 9, § 1107 A. But a violation of tribal law would probably not preclude the admission of a defendant's statement in federal court. *See, e.g., United States v. Chavez–Vernaza*, 844 F.2d 1368, 1372 (9th Cir.1987) (evidence obtained in violation of state law but in compliance with federal law is admissible in federal court). The government escapes compliance with federal law, however, because the majority asserts that Doe was in tribal custody.

The majority holds that Doe will be considered in "federal custody" only if he can prove that tribal and federal police conspired to deny Doe's federal procedural rights. *See* Maj. op. at 1078. This "conspiracy" standard exalts form far above substance and sets the bar much too high for juvenile criminal defendants. A juvenile should be considered in "federal custody" if tribal custody is done to further the interests of a federal investigation. Here, tribal police arrested Doe and held him for federal authorities so he could be interrogated about crimes solely within federal jurisdiction. This working arrangement between tribal and federal police is entirely routine and should not work to deprive tribal juvenile arrestees of their federal statutory rights.[5]

> Q. However, you can recall specifically that he was given the opportunity to have his parent present. Is that your testimony?
> A. Yes.
> Q. And how was it that you are so sure that Agent Burke had advised him that he could have his parents present?
> A. How I am so sure?
> Q. Yes.
> A. Cause I remember him asking.
> . . .
> Q. Were there any preliminary questions asked, for instance, his age, his education, his background?
> A. Yes.
> . . .
> Q. . . . Did you—were you aware that he was only 17 at the time?
> A. [Doe]?
> Q. Yes.
> A. Yes.

4. Q. (Prosecutor) Now, did you discuss with him whether or not he wished to have a parent present?
A. (Burke) I don't recall that.

> . . .
> Q. And any particular reason that you're not—that you're aware of that you did not ask him about his parent?
> A. No.
> . . .
> Q. (Defense counsel) At the time you observed [Doe], were you able to determine or did you even attempt to determine whether or not he was a teenager, an adult, or his age—any age, I should say?
> A. I don't think I even attempted.
> . . .
> Q. Did it ever cross your mind, prior to asking him his age, that he may be a juvenile?
> A. I don't think it ever came up.

> Q. Well, I guess my question is, based on your experience and what you observed, did it ever cross your mind that the person that you were interrogating was a juvenile?
> A. I don't think it ever did cross my mind.
> . . .
> Q. Nowhere in your report does it say that [Doe] requested that his parents be present; is that correct?
> A. That's correct.
> Q. And so you did not ask him if he wanted his parents to be present; is that correct?
> A. I don't recall asking him that.
> Q. And, in fact, at least in your mind, you would have had no reason because you didn't know he was a juvenile; is that correct?
> A. I wouldn't have—that's a fair statement.
> . . .
> Q. Is there an FBI policy for interrogating juveniles?
> A. For interviewing juveniles that are in federal custody, yes there is.
> Q. And in your—and what is that policy?
> A. Without referring to the manual, I believe, in a nutshell it says, they're not to be interviewed pending, perhaps, consultation with the U.S. Attorney's office. I'm not exactly sure how it reads, but in a nutshell, they're not to be interviewed.
> Q. And you are free to interview any juvenile who may be a suspect as long as he's not in federal custody?
> A. As long as he's not in federal custody, yes, sir.

5. *United States v. Alvarez–Sanchez*, 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994), and *United States v. Juvenile Male*, 74 F.3d 526 (4th Cir.1996), do not support the majority's new "conspiracy" standard. *Alvarez–Sanchez* simply stands for the proposition than 18 U.S.C. § 3501 applies only to persons in federal custody. *See*

We would affirm the district court's well-documented and routine determination concerning Doe's statement to federal authorities. If our standards of review are to mean anything, they must be consistently applied in every situation, whether the government or the criminal defendant prevails in a suppression hearing.

---

511 U.S. at 358, 114 S.Ct. 1599. The question before this court is not whether § 5033 applies only to detainees in federal custody, but what constitutes federal custody. *Juvenile Male* mere-

ly holds that administrative detention pending deportation proceedings is not "custody for an alleged act of juvenile delinquency." *See* 74 F.3d at 530.