UNITED STATES of America,
Plaintiff–Appellee,

v.

Michelle Lyn MICHAUD, Defendant–Appellant.

No. 99–10440.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 2001

Filed Sept. 25, 2001

Glynn Burroughs Cartledge, Reno, Nevada, for the defendant-appellant.

Ronald C. Rachow, Daniel G. Bogden, Assistant United States Attorneys, Reno, Nevada, for the plaintiff-appellee.

Before: REINHARDT, RYMER and FISHER, Circuit Judges.

Opinion by Judge FISHER; Dissent by Judge REINHARDT

FISHER, Circuit Judge:

Appellant Michelle Michaud entered a conditional guilty plea to a charge of violating 18 U.S.C. § 1201(a)(1), kidnapping and transporting a victim across state lines. On appeal she challenges her conviction, contending that her incriminating statements should have been suppressed and her sentence was improperly enhanced. For the reasons detailed below, we affirm.

I.

After a joint investigation by the FBI and the Placer County, California Sheriff's Department into a kidnapping and sexual assault, law enforcement officials isolated Michaud and her boyfriend, James Daveggio, as suspects and located them at a motel in Stateline, Nevada. The Placer County police secured warrants for their arrest on December 2, 1997. Aware of the existence of the state warrants, FBI Agent Lynn Ferrin led a group of agents to Michaud's hotel the following day. Another agent knocked on Michaud's door, claimed to be the assistant manager of the hotel and told her that her boyfriend was sick and needed her assistance. In reality, Daveggio had already been apprehended. When Michaud opened the door, the agents placed her under arrest, took her to another hotel room and handcuffed her to a chair. Ferrin secured Michaud's signature on consent forms to search her room and her vehicle. He then advised her of her *Miranda* rights, and she signed another form indicating she understood and waived those rights.

FBI agents and Placer County detectives then proceeded to interview Michaud.

When she indicated she wanted to speak to a lawyer, the interview was terminated and Michaud was booked into the Douglas County, Nevada jail on the state warrant and for possession of controlled substances.

The federal agents' search of Michaud's van revealed more evidence. Based on this material, a magistrate judge issued a federal arrest warrant for Michaud on December 5, 1997 on charges of kidnapping and aiding and abetting.

Also on December 5, Michaud and her cellmate, Teresa Agoroastos, learned that Michaud and her boyfriend had been featured on a television news report in connection with a murder. Michaud became distraught, and began telling Agoroastos, "I'm scared. I'm in a lot of trouble." Agoroastos contacted Deputy Douglas Conrad over the intercom and said that Michaud needed to talk to somebody. Conrad told the women to meet him at the gate in front of their dorm. Agoroastos led Michaud by the arm to the gate. At this point, both women were crying. Agoroastos told Conrad that Michaud had information about a murder and needed to talk to someone; Michaud remained silent, neither confirming nor denying the statement. Conrad told the women to return to their cellblock and contacted his supervisor, Sergeant Arnie Digerud, who in turn informed detectives of the request. Digerud then instructed Conrad to place Michaud in a holding cell.

Approximately one hour later, Douglas County Sergeant Timothy Minister took Michaud to an interview room, where they met with FBI Agent Christopher Campion. After turning on a tape recorder, Campion said:

> Michelle, we just started talking and uh, I just want to ask you just to make sure that I'm under, I'm clear that you want to talk to us, to me, and to Detective Minister here, Tim, um, about something that's obviously bothering you. You're obviously emotional right now and it's something that you, you need to get off your chest. Is that true?

Michaud answered, "I have some information about the young lady who was killed, a couple of days ago. Yes." Minister and Campion then informed Michaud of her *Miranda* rights, including her right to have an attorney present during questioning. Once she indicated that she understood these rights and signed a waiver, they began to interview her. The interview lasted roughly nine hours. Campion and Placer County Detective Desiree Carrington interviewed Michaud again on December 6. The following day Michaud was hospitalized after collapsing in her cell. She was interviewed at the hospital for approximately an hour. The officers spoke to her again on December 8.

Also on December 8, Placer County yielded priority of their prosecution to the federal government. Michaud was taken into federal custody the next day, brought before a federal magistrate in Reno and had counsel appointed for her. She was subsequently indicted on charges of kidnapping and transportation across state lines and conspiracy to commit the same, in violation of 18 U.S.C. § 1201(a)(1) and (c). On October 27, 1998, Michaud moved to suppress the statements she made during her interviews with law enforcement officials. The district court denied this motion November 13, 1998, after which Michaud entered a conditional guilty plea on the kidnapping charge. On August 12, 1999 the court sentenced Michaud to 152 months in prison. This appeal followed.

## II.

■ Michaud argues that the court erred in denying her motion to suppress

her incriminating statements because her arrest was unlawful, state and federal officials colluded to deprive her of her right to a timely appearance before a federal magistrate judge and she was interrogated after invoking her right to counsel. We review motions to suppress de novo, but we review the trial court's factual findings for clear error. *United States v. Kemmish,* 120 F.3d 937, 939 (9th Cir.1997).

### A. Lawfulness of the Arrest

■ Michaud contends that the ruse the officers used to persuade her to open the door of her hotel room violated her Fourth Amendment rights, and that the inculpatory statements she subsequently made to them should be suppressed as the fruits of the unlawful arrest. She acknowledges that a valid warrant for her arrest existed at the time of the ruse, but contends that "the Placer County warrant was itself used as a ruse by the FBI to create an opportunity for interrogation."

Michaud's objection to the use of trickery to encourage her to open her hotel room door is unavailing, given the existence of a valid warrant. We have held that "[t]here is no constitutional mandate forbidding the use of deception in executing a valid arrest warrant." *Leahy v. United States,* 272 F.2d 487, 490 (9th Cir. 1960); *see also United States v. Contreras–Ceballos,* 999 F.2d 432, 435 (9th Cir. 1993) (holding that an officer was justified in claiming to be a Federal Express agent when executing a warrant). Because the warrant was valid, we cannot accept her argument that the FBI's use of the warrant was somehow improper. We affirm the district court's denial of Michaud's motion to suppress based on the unlawfulness of her arrest.

### B. State and Federal Collusion

■ Michaud argues that the Placer County officers colluded with the FBI agents to deprive her of her Sixth Amendment right to counsel and her rights under Fed.R.Crim.P. 5(a) and 18 U.S.C. § 3501(c). Under Rule 5(a), an arrested individual must be taken without unnecessary delay before a federal magistrate. We look to § 3501(c) to determine whether an otherwise voluntary confession made during a period of unnecessary delay must be excluded.[1] *United States v. Van Poyck,* 77 F.3d 285, 288 (9th Cir.1996). Under that provision:

> In any criminal prosecution by the United States ... a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate ... if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsec-

---

**1.** The other provisions of § 3501 specify that a confession may be admissible if voluntarily given and delineate factors to be taken into account in determining voluntariness. 18 U.S.C. § 3501(a), (b). We note that, aside from her § 3501(c) argument, Michaud does not challenge the voluntariness of her confession. We therefore do not address the impact of this delay on the voluntariness of her con-

fession, *see Greenwood v. Fed. Aviation Admin.,* 28 F.3d 971, 977 (9th Cir.1993) ("We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant ...."), although we find the state officials' delay in bringing Michaud before a magistrate extremely troublesome.

tion shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

18 U.S.C. § 3501(c). Thus, the provision creates a six-hour "safe harbor" between the commencement of detention on a federal charge and appearance before a magistrate judge during which a voluntary confession is admissible. Voluntary confessions occurring after the safe harbor period may still be admissible if the court determines that the delay was reasonable or if public policy favors admission. *Van Poyck*, 77 F.3d at 288–89.

■■■■ Michaud was taken into federal custody on December 9 and promptly taken before a federal magistrate. She argues, however, that her state custody was the result of collusion between state and federal authorities; as such, the relevant delay should be the period between her initial state arrest and her appearance before the federal magistrate judge, some six days later. The relevant delay may indeed be calculated from the time of arrest by state or local authorities on state charges "if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate [her] in violation of [her] right to a prompt federal presentment." *United States v. Alvarez–*

*Sanchez*, 511 U.S. 350, 359, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). The defendant has the burden to prove the existence of such actual collaboration; "[a] bare suspicion that there was cooperation between the two agencies designed to deny fundamental rights is not sufficient." *United States v. Doe*, 155 F.3d 1070, 1078 (9th Cir.1998) (en banc) (quoting *United States v. Leeds*, 505 F.2d 161, 163 (10th Cir. 1974)).

■■■■ Placer County police and the FBI had been jointly investigating Michaud and Daveggio. Michaud was arrested under a California state warrant for kidnap and sexual assault and later booked by Nevada authorities on drug charges.[2] The FBI participated in her arrest and questioned her after she was in custody. Interviews of persons in state custody by federal authorities are permissible, and statements obtained during such questioning are generally admissible. *United States v. Halbert*, 436 F.2d 1226, 1229 (9th Cir.1970); *see also Alvarez–Sanchez*, 511 U.S. at 360, 114 S.Ct. 1599. The agents obtained a federal warrant for Michaud's arrest on December 5, obtained priority of prosecution from state officials on December 8 and executed the warrant for her arrest December 9. The cooperation between the state police and the FBI, both in conducting interviews and in taking Michaud into federal custody, appears on its face to have been unobjectionable. As soon as the federal agents gathered sufficient evidence against Michaud from the

---

**2.** Under Nevada law, a person arrested on an out-of-state warrant must be brought before a magistrate for a probable cause determination "without unnecessary delay." NRS §§ 171.158, 171.178 (1999). Although the state police did not comply with their constitutional duty to bring Michaud before a magistrate within 48 hours of her arrest, *see County of Riverside v. McLaughlin*, 500 U.S. 44, 57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991)

("A jurisdiction that chooses to offer combined [probable cause determination and arraignment] proceedings must do so as soon as is reasonably feasible, but in no event later than 48 hours after arrest."), this delay cannot be attributed to the federal agents and considered for purposes of § 3501(c) absent evidence of collusion. *See United States v. Halbert*, 436 F.2d 1226, 1229 (9th Cir.1970).

search of her van, they obtained an arrest warrant and took the steps necessary to prosecute her in federal court.

▮ A finding of collusion requires proof of a deliberate intent to deprive a defendant of her federal procedural rights. *Doe*, 155 F.3d at 1078. The mere suspicion of collusion that Michaud describes is insufficient. *See id.* Michaud offers no evidence of actual collusion between the state authorities and the FBI to deny her her federal right to appear before a magistrate judge. The district court found that Michaud's allegations of collusion amounted to "no more than unsupported suspicion," and determined that the exchange of information between federal and state investigators was sparse. On appeal, Michaud has not shown these factual determinations to be clearly erroneous. *See Kemmish*, 120 F.3d at 939. We therefore affirm the district court's holding that Michaud's rights were not infringed by impermissible collusion between federal and state authorities.

### C. Custodial Interrogation

▮ Once an accused has invoked her right to counsel during interrogation, she may not be subjected to further police interrogation "unless the accused [her]self initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). During an interview with police on December 3, Michaud indicated her desire to speak to an attorney, and the interview was immediately terminated. She was not interviewed again until December 5, when Agoroastos, leading her by the arm to the gate outside Michaud's dorm, told Deputy Conrad that Michaud wanted to speak to someone "about a murder" and Michaud subsequently confirmed to Sergeant Minister from the Douglas County Sheriff's De-

partment and FBI Agent Campion that this was true. We must therefore decide whether, under the facts of this case, Michaud may be said to have initiated communication with the police after having previously invoked her right to counsel.

The relevant facts, in all material respects undisputed, are as follows. Conrad testified that Agoroastos summoned him on the intercom and told him that Michaud "needed to talk to somebody." When Conrad approached Michaud and Agoroastos at the gate, Agoroastos told him that Michaud "needed to talk to somebody about a murder that had happened in Alpine County." In context, "somebody" was reasonably understood to refer to the police authorities. Michaud stood next to Agoroastos, crying, and said nothing. She testified that at this point she was shaken up, upset and scared. She heard Agoroastos tell Conrad she had information about a murder and should talk to somebody; she stayed silent, neither confirming nor denying the statement.

Conrad told the women to return to their cellblock and informed Digerud of the incident. Digerud had Michaud taken into an isolation cell, where she stayed, free from anyone's influence, for roughly an hour. During that time, Michaud had the opportunity to change her mind about talking to the officers, and was not questioned.

▮ In response to a Douglas County detective's call informing them about Michaud's situation, Sergeant Minister and Agent Campion came to speak to her. After hearing that Michaud and Agoroastos had approached Conrad, the officers had the right to inquire whether she was reinitiating communication. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (no *Edwards* violation where defendant appeared to initiate further communication by asking an

ambiguous question, a police officer reminded him he did not need to talk and defendant said he understood). Campion testified that, prior to learning Michaud wanted to talk, he had no plans to interview her.

Upon arriving at the interview room, Campion introduced himself and told Michaud he understood she wanted to speak to someone about something she needed to get off her chest, and asked if that was true. She responded, "I have some information about the young lady who was killed a couple of days ago. Yes." Campion then showed Michaud her *Miranda* rights on a written form and read them to her, explaining that she had a right to consult with a lawyer for advice before questioning, a right to have a lawyer present during questioning and a right to stop answering the detectives' questions at any time. Only after Michaud indicated that she had something she wanted to say, that she understood her rights and signed a waiver did Minister and Campion begin to interview her.

From the testimony of Conrad and Michaud, we accept that Michaud was upset, frightened and crying when Agoroastos suggested speaking to somebody about the murder. Although Michaud herself may not have initiated the conversation with Conrad, she went to the gate with Agoroastos, did not resist speaking to authorities and did not contradict what Agoroastos said at any time. Michaud testified about her recollection of the event as follows:

Q: Did Theresa tell you to go see the deputy?

A: No.

Q: Did Theresa tell you that she was going to take you up to see the deputy?

A: No.

Q: Why did you go up to see the deputy?

A: I didn't go to see the deputy.

Q: Did Theresa grab you by the arm and pull you up to see the deputy?

A: She had me by the arm. When the door opened, we went out, and she brought me up to the gate, and she told the officer.

Q: That you wanted to talk to the police?

A: No, she said—I'm trying to remember how she said it. I believe she said she had some information about a murder.

Q: And you didn't tell the deputy that you didn't, did you?

A: I didn't say anything to the deputy at all.

Q: You just stood there?

A: Yeah, I was upset.

Q: You didn't go back to your cell?

A: No.

Q: You just stayed there?

A: With Theresa, yes.

Q: And you didn't tell the deputy that you didn't want to go with him, did you?

A: The deputy didn't ask me.

Q: You never told the deputy you didn't want to go with him, did you?

A: No, I don't think so.

Q: And you never told the deputy that you didn't want to ·speak to the police, did you?

A: I didn't say anything. I didn't know.

Q: Well, you were standing right there, you heard precisely what Theresa said because you're able to repeat it now, right?

A: Yes.

.     .     .     .     .

Q: And you never told the deputy, "No, I don't want to talk to the police," or, "No, I don't have any information about a homicide," did you?

A: No, I didn't.

■ In sum, it is clear that Campion's inquiry about Michaud's desire to "get something off her chest" and his and Minister's subsequent questioning of her were triggered by Agoroastos' statements in Michaud's presence that Michaud had information about a murder she needed to talk about. The question then is: can Michaud's behavior, under the totality of the circumstances, fairly be construed as an initiation *by her* of further communication with the police, such that the officers' reactions thereafter did not amount to "police-initiated custodial interrogation"? As the Supreme Court explained in *Edwards*:

[W]hen an accused has invoked [her] right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that [she] responded to further police-initiated custodial interrogation even if [she] has been advised of [her] rights.... [A]n accused ..., having expressed [her] desire to deal with the police only through counsel, is not subject to further interrogation by the authorities ... unless the accused [herself] initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. 1880. Taken together, Michaud's going with Agoroastos to the gate as Agoroastos initiated communication with Deputy Conrad, her apparent agreement with Agoroastos' assertion that Michaud had "information about a murder" she wanted to talk about and Michaud's subsequent behavior and response

to Campion's initial inquiry all indicate that she wanted to talk to the authorities.[3] We therefore hold that the questioning of Michaud was initiated by her, not by the police.

■ We accept that *Edwards* and its progeny establish a clear line preventing police initiation. By the same token, however, these cases recognize that the accused may change her mind and initiate communication. It is a factual question whether that is what occurred. On these facts, we conclude Michaud initiated, and the police merely reacted to her. They did not seek to speak with her until they were approached with the information that Michaud wished to speak about a murder. The Supreme Court has explained that the rule established in *Edwards* was "designed to prevent police from badgering a defendant into waiving [her] previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). At no point did the law enforcement officials unconstitutionally attempt to coerce Michaud into speaking with them. No allegation has been made, nor does any evidence in the record suggest, that Agoroastos was acting on behalf of the police, or complicitly with them, when she spoke to Conrad. Michaud was present when Agoroastos represented that Michaud had "information about a murder" she wanted to convey. If Michaud did not want to subject herself to questioning, she could have easily said so. Conrad, confronted with Agoroastos' information and Michaud's apparent tacit approval of her cellmate's statements, acted appropriately by ceasing his own communication with her and contacting his supervisor. Sergeant Digerud properly informed the

---

**3.** We believe Michaud's behavior under these circumstances is sufficient to constitute what the dissent characterizes as "a statement that

reasonably leads the police to believe that she may desire to talk." Dissent at 741.

investigating officers of the request. Minister and Campion correctly confirmed that Michaud was not being coerced, and that the initiative was hers, by asking her at the start of the taped conversation whether it was true that she wished to speak to them. They began questioning her only after receiving her affirmative response and informing her of her *Miranda* rights. Given the propriety of the officers' behavior, we hold that the resumption of interrogation did not violate Michaud's constitutional rights, and was fully consistent with the requirements of *Edwards*.

Our holding is not at odds with *United States v. Rodriguez*, 993 F.2d 1170 (5th Cir.1993). In *Rodriguez*, Gary Shaw, one of a group of co-defendants, called an FBI agent and informed him that the group wanted to speak to him. *Id.* at 1173. The agent then took a statement from Rodriguez, one of Shaw's co-defendants, outside of the presence of his attorney. The court held that Rodriguez had not initiated contact with the authorities, so his subsequent statements were inadmissible. Unlike the circumstances here, there was no indication that Rodriguez assented to Shaw's contention that the group wished to speak to the authorities. Indeed, Shaw told the FBI agent only that "they" wished to speak to him, not specifying whether Rodriguez was among those expressing this desire. Here, in contrast, Agoroastos purported to speak on behalf of Michaud in Michaud's presence, and Michaud never indicated that she disagreed with Agoroastos' representations.

In light of Michaud's acquiescence in Agoroastos' characterization of her wishes, creating the appearance of Michaud's desire to provide information to the police,

Michaud's confirmation in response to Campion's inquiry and the absence of official coercion, we hold that no constitutional violation occurred and thus affirm the district court's denial of Michaud's motion to suppress.

### III.

Michaud also contends that the district court erred in its application of the Sentencing Guidelines. U.S.S.G. § 2A4.1, the section applicable to kidnapping, abduction and unlawful restraint, establishes a base offense level of 24. One subsection, § 2A4.1(b)(7)(A), states that another offense committed during the kidnapping requires the court to apply "the offense level from the Chapter Two offense guideline applicable to that other offense if such offense guideline includes an adjustment for kidnapping, abduction, or unlawful restraint, or otherwise takes such conduct into account." This subsection is to apply if the cross-referenced section would result in a higher offense level than the sentence resulting from application of § 2A4.1. U.S.S.G. § 2A3.1 applies to criminal sexual abuse of the type at issue in this case, and contains a specific enhancement for instances of abuse where the victim was abducted. In keeping with § 2A4.1(b)(7)(A) the court cross-referenced § 2A3.1 to determine the correct offense level. The base offense level of 27 under that section, adjusted upward by four levels because the offense was committed by the means set forth in 18 U.S.C. § 2241(a) (aggravated sexual abuse by force or threat) and an additional four levels due to the abduction, resulted in an offense level of 35.[4]

---

4. The court applied a three-level reduction for acceptance of responsibility, arriving at a fi-

nal offense level of 32.

Michaud, however, notes that § 2A4.1 contains a separate provision for kidnapping involving the sexual exploitation of the victim. *See* U.S.S.G. § 2A4.1(b)(5). If the court applied this subsection, the resulting offense level would be a base level of 24 for the kidnapping, increased by three levels for the sexual exploitation, resulting in an offense level of 27. A contrary interpretation, she argues, would render § 2A4.1(b)(5) superfluous.

Section 2A4.1(b)(7) states unambiguously that the offense level calculation from the other offense committed during a kidnapping is to apply "if the resulting offense level is greater than that determined" using § 2A4.1. Here, the cross-referenced section resulted in a higher offense level—indeed, that is the sine qua non of this portion of the appeal. We therefore hold that the district court did not err in its application of the Sentencing Guidelines.

## CONCLUSION

The law enforcement officers' use of a ruse to arrest Michaud was proper; she failed to prove the existence of collusion between state and federal officials that rendered the delay between her arrest on state charges and her appearance before a federal magistrate violative of her rights under 18 U.S.C. § 3501(c); and the police did not initiate questioning after she had invoked her right to counsel. Accordingly, we affirm the district court's denial of Michaud's suppression motion. We also hold that the district court properly applied the Sentencing Guidelines.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

I dissent because the facts in this case present a clear cut violation of *Edwards v.* *Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and there is no basis in law for the unprecedented legal theory upon which the majority bases its contrary ruling.

As my colleagues recognize, in *Edwards,* the Supreme Court established a bright-line rule prohibiting the interrogation of a suspect in custody who invokes the right to counsel, "unless the *accused himself initiates* further communication, exchanges, or conversations with the police." *Id.* at 485, 101 S.Ct. 1880 (emphasis added); *see also id.* at 486 n. 9, 101 S.Ct. 1880 (stating that authorities must show "the necessary fact that the accused, not the police, reopened the dialogue with the authorities"); *Collazo v. Estelle,* 940 F.2d 411, 418 (9th Cir. 1991). The Supreme Court has repeatedly emphasized that *Edwards* provides a "rigid," "bright-line" rule, and "clear and unequivocal guidelines" to law enforcement. *Arizona v. Roberson,* 486 U.S. 675, 681–82, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Michigan v. Jackson,* 475 U.S. 625, 634, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

Contrary to the majority's position, Michaud clearly did not "initiate" the communications with the police, as required by *Edwards.* There is no evidence that Michaud ever stated that she wanted to talk to the authorities prior to the time they questioned her. The phone call to Deputy Conrad was made by Michaud's cellmate, Agoroastos, who told the deputy that Michaud "needed to talk to somebody." Agoroastos appears to have reached this conclusion on her own. The majority does not contend that Michaud ever told Agoroastos that she wanted to talk, let alone that she wanted to talk to the police; as the record shows, Michaud merely said to her, "I'm

scared. I'm in a lot of trouble."[1] On that basis, Agoroastos made her decision that Michaud "needed to talk." Michaud never said anything to Agoroastos that suggested that she herself was initiating a conversation with the police, that she desired to do so, or that she wished to talk with anyone at all. To me, it is clear that it was first Agoroastos, indirectly, and then Deputy Conrad, directly, who initiated the inculpatory exchanges, and that Michaud was not the initiator.

Furthermore, even if one were to presume that someone who is in jail and has refused to talk to the police because she desires counsel would, upon discovering that her trouble is worse than she had previously thought, want to talk to someone right away, it is highly unreasonable to assume, as the majority blithely does, that it was the police to whom she wanted to speak. Obviously, it is far more likely that if Michaud really "needed to talk to somebody," it was to the lawyer to whom she had said she wanted to speak two days earlier, even before her circumstances worsened.

The majority claims that although Michaud remained silent, her conduct evinced a willingness to talk. In the course of reaching this unprecedented legal conclusion, my colleagues run roughshod over the facts as well as the law. They fail to acknowledge, for example, that by asking Agoroastos to bring Michaud to the front

of the dorm area so that he could talk to her, it was Deputy Conrad who sought to initiate communications with Michaud, not vice-versa. Indeed, Michaud's actions demonstrated only that she was in a state of extreme emotional upset, that she followed all directions she was given, and that she was *not* volunteering to talk to the police. When, in accordance with Deputy Conrad's directions, Agoroastos took Michaud by the arm and brought her to the gate, Michaud was in a state of acute distress: she was crying, but she said nothing. She remained silent even when Agoroastos discussed the nature of her criminal problem with Deputy Conrad, and then, subsequently, when she was taken to an isolation cell. She also maintained her silence for the hour in which she was left in that cell and after that, when she was being taken by Sergeant Minister from the cell to the interview room. During all of that time, Michaud remained silent: she never once made any statement or expressed any desire to talk.[2]

As Michaud remained silent at all times, she, of course, did not state to the deputy or her cellmate that she did *not* want to talk to the police. The majority argues that this demonstrates Michaud's tacit approval of Agoroastos's statements and her own willingness to talk, because "she could have easily said" she did not want to "subject herself to questioning." It is true that Michaud could have said so, but she is not

---

1. *See United States v. Rodriguez,* 993 F.2d 1170, 1174 (5th Cir.1993) (holding that co-defendant's statement that, " 'they' wanted to speak to him," was not initiating conversation as there was no testimony that defendant asked co-defendant to call FBI agent); *cf. Neuschafer v. Whitley,* 816 F.2d 1390, 1392–93 (9th Cir.1987) (holding that defendant initiated conversation because he passed a note to prison guard on duty indicating his desire to talk).

2. To the extent that Deputy Conrad may have believed that, because Michaud was present, Agoroastos was accurately reporting Michaud's desires, the proper course of action under *Edwards* was clear. It was not to isolate Michaud in a cell and then have an FBI agent come to the jail to interrogate her. Instead, the correct procedure would have been for Conrad simply to say to Agoroastos, in Michaud's presence, "I cannot question her further, unless *she* tells me directly that she wishes to speak with me or with some other officer."

required to under *Edwards*. To the contrary, the rule the majority suggests is in direct violation of the spirit, the purpose, and the clear mandate of *Edwards*. The whole point of *Edwards* is that a suspect who has invoked her right to counsel may remain silent, and may not be questioned unless she breaks that silence by initiating communications with the police. She is not required to say *anything* further until after she consults with counsel (and, in fact, not even then). It is therefore strange indeed that the majority reasons that Michaud's act of remaining silent is precisely what constitutes the initiation of communications with the police. If that becomes the rule, bye-bye *Edwards*.[3]

The majority argues that the police had the right, under *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), to clarify whether Michaud was initiating a conversation with them. The problem with this argument is that *Bradshaw* applies only when the suspect makes a verbal inquiry of the police or otherwise makes a statement that reasonably leads the police to believe that she may desire to talk. In *Bradshaw*, the defendant asked, " 'Well, what is going to happen to me now?' " *Id.* at 1045, 103 S.Ct. 2830. The Court held that Bradshaw's verbal statement—his question—rendered it appropriate for the officer to seek to clarify whether the defendant wanted to speak about the crime. *Id.* at 1046, 103 S.Ct. 2830. In this case, Michaud never made any inquiry of, or statement to, the police at all. She simply remained silent, as *Edwards* makes clear is her unqualified right.

It is one thing to say that a suspect's ambiguous statement may constitute the initiation of an uncounseled interrogation by law enforcement officials and that the police may therefore explore that ambiguity with the suspect; it is another to say that silence can trigger an officer's right to question a suspect, notwithstanding the suspect's prior assertion of her rights. Unless we maintain a clear line between a suspect's *speech* that may be said to initiate exchanges with the police and nonverbal *conduct* that may not, we will relegate *Edwards* to the judicial junk pile where so many other enlightened decisions designed to protect individuals' rights now rest. What is required under *Edwards* is clear—speech that invites further communication with the police. Conduct (or "behavior" as the majority terms it), ambiguous or otherwise, does not suffice. The majority's ruling to the contrary finds no support in any opinion published in this circuit or any other, or in any Supreme Court decision.

It is irrelevant to the *Edwards* analysis that Michaud spoke freely and voluntarily after being asked if she wanted to talk. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880; *Desire v. Attorney General of California*, 969 F.2d 802, 805 (9th Cir.1992); *United States v. Whaley*, 13 F.3d 963, 968 (6th Cir.1994). It is similarly irrelevant that Michaud was reread her *Miranda* rights after she began to speak. *Roberson*, 486 U.S. at 685, 108 S.Ct. 2093; *Desire*, 969 F.2d at 805. What is critical to the analysis is the fact that Michaud never said that she wished to talk to the authorities until after: a) she was told to meet the

---

**3.** By arguing that Michaud's silence "initiated" communications with the police, the majority effectively uses Michaud's silence against her. Such a use of her silence is contrary to the spirit of our jurisprudence on the use of silence against arrested suspects. *See Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct.

2240, 49 L.Ed.2d 91 (1976) (holding that use of post-*Miranda* silence for impeachment purposes violates 14th amendment); *United States v. Whitehead*, 200 F.3d 634, 639 (9th Cir.2000) (holding that State's usage of or comment on defendant's pre-*Miranda*, post-arrest silence is unconstitutional).

deputy; b) she was placed in an isolation cell; c) she was brought to an interrogation room; and d) Agent Campion asked her if it was true that she had something she wanted to get off her chest.[4] It was only after all of this *police-initiated* action that Michaud spoke.[5]

The majority points to the "absence of official coercion" as support for its holding that no violation of *Edwards* occurred. However, simply because the police do not badger a suspect into answering their questions does not mean that it becomes acceptable for the police to initiate discussions with her after she has asserted her right to counsel. *Edwards* is clear. It does not matter in what tone or manner the police speak; the police may not initiate the interrogation of a suspect who has invoked that right.

As the Supreme Court stated: "The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application." *Minnick v. Mississippi,* 498 U.S. 146, 151, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). If we allow silence and body gestures to constitute "initiation," including failures by upset and confused suspects to comment on the statements of others, the police will be able in most circumstances to find a justification for interrogating persons taken into custody despite their clear and affirmative invocation of the right to counsel. What is then left of the "clarity" and "certainty" of *Edwards,* a "clarity" and "certainty" that we were told as recently as 1990 was the

essential benefit derived from the rule? Not much.

In sum, the majority gives a new meaning to the term "bright-line" when it holds that a "bright-line" rule that the defendant must "initiate" the conversation is satisfied by a defendant's silence that constitutes "apparent" agreement, or "creat[es] the appearance of [a] desire," that "indicate[s]" that the defendant wants to do the opposite of what she has previously stated without qualification that she wishes to do. Similarly, if the majority's explanations result in "clear and unequivocal guidelines" regarding the prohibition against further questioning of defendants, we can simply dispense entirely with the concept of "clear and unequivocal guidelines." For, in addition to eliminating the bright-line distinction between speech and conduct, the majority creates a new and strange form of "clear and unequivocal" conduct: conduct that is not definitive, but that merely "creat[es] an appearance of" or "indicate[s]," in the perception of the police officers observing it, some kind of "apparent" desire to speak; conduct that, at the very least, would require judges as well as police officers, to attempt to discern, largely on the basis of the actions of third parties, a defendant's unexpressed intentions to surrender her constitutional rights.

I believe that the authorities violated Michaud's Fifth Amendment rights when they interrogated her on December 5, and then again in subsequent interviews on

---

4. A defendant's statement in response to a question such as "do you want to talk about anything?" is not an initiation by the defendant; such a statement by the authorities is a direct violation of *Edwards*. *Desire,* 969 F.2d at 804.

5. The majority characterizes these police actions as "reactions" in an attempt to suggest that they were in response to Michaud's initiation of a conversation. *See* Majority at 737, 738. However, as long as the officers' actions were not in response to a statement personally made by the suspect, which in this case they were not, these "reactions" to the nonverbal conduct of Michaud or the statements made by third parties constitute "police-initiated" actions with respect to Michaud.

December 6, 7, and 8. Therefore, the statements made on those occasions should be suppressed. For these reasons, I respectfully dissent.