Misael **PADILLA**

v.

Thomas **HARRIS**, **Angela Papale**, **and Peter O'Meara**

No. **3:01CV1661(JBA).**

United States District Court, D. Connecticut.

Sept. 30, 2003.

Dawne Westbrook, Middletown, CT, John R. Williams, Williams & Pattis, New Haven, CT, for Plaintiff.

Eleanor M. Mullen, Attorney General's Office, Employment Rights, Hartford, CT, for Defendants.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### [DOC. # 34]

ARTERTON, District Judge.

Plaintiff Misael Padilla brings this suit under 42 U.S.C. § 1983, alleging two violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in connection with his termination from employment as a staff member of the Connecticut Department of Mental Retardation ("CDMR"). Padilla argues he was discharged for a violation of work rules related to an incident occurring late July 11 and early July 12, 2000 at CDMR's Pond View Group Home ("Pond View") but that two female co-workers, Kathy Martin and Virginia Franks, were not disciplined at all for their similar violations in connection with the same incident. Defendants now move for summary judgment, arguing *inter alia* that, as a matter of law, Padilla was not similarly situated to Martin or Franks. For the reasons set forth below, defendants' motion [doc. # 34] is GRANTED.

### I. Factual Background

Padilla was employed as a Mental Retardation Worker ("MRW") by CDMR from 1994 until his termination on October 28, 2000. During the majority of that time, Padilla provided care to clients at Pond View. During all times relevant to the present action, defendant Thomas Harris was Personnel Manager of the Northwest Region and Southbury Training School of CMDR, defendant Angela Papale was Assistant Regional Director for the Northwest Region of CMDR, and defendant Peter O'Meara was Commissioner of CMDR.

Prior to July 11/12, 2000, Padilla's disciplinary record consisted of a five day suspension for an incident of client neglect in

December of 1998. He was notified of the suspension by letter from Papale dated February 10, 1999, which provided explanatory detail: Padilla had transported a client to a day program in downtown Waterbury but had failed to escort the client into the building where the program was located and instead drove away. Because the building was closed, the client was left unattended for several hours in an urban location and failed to receive a scheduled dose of medication. The letter included notice of the need to improve work performance and warned that failure to show improvement would result in additional action up to and including dismissal from state service.

Padilla had received formal training on a yearly basis on CDMR's "DMR–2 Abuse and Neglect Policy", which requires "the department [to] ensure that persons with mental retardation are free from abuse, neglect and/or mistreatment," and defines neglect as "[t]he deprivation of care, services, or proper attention to the needs of mentally retarded persons because of carelessness, failure of oversight, or purposeful negligence to provide." On May 22, 1999, plaintiff signed as receiving the "Department of Mental Retardation Work Rules," which include the following statements:

> A single violation of any of these work rules may lead to disciplinary action, up to and including suspension or dismissal.

> Physical, sexual, verbal, or psychological abuse or neglect of persons with mental retardation is prohibited.

On both October 16, 1999 and April 30, 2000, Padilla received a one page document entitled "Operational Directive No. 11c, subject: Care/Communications" ("Operational Directive"), which, as significant to this motion, requires

> At a minimum, individuals are to be visually checked every 30 minutes.

Individuals who are asleep require that the employee visually check person every 30 minutes, (i.e. open door, utilize flashlight, if necessary).

Padilla confirmed in his deposition that he was familiar with this Operational Directive.

On July 12, 2000, 45 minutes into her shift, Virginia Franks, also a MRW at Pond View, discovered one of Pond View's clients, a 35 year old severely retarded woman, asleep with facial injuries of unknown origin, including dried blood from the nose, swollen left eyelid, left cheek and left upper lip, and abrasion under the left eye. There was also a moderate amount of blood found on a towel covering the client's pillow as well as on the client's pajama top. Padilla had worked alone from 9 p.m. to midnight, at which time the shift changed and Franks replaced him. The staff on the shift just prior to Padilla's reported this client to have had no injuries when they left.

On July 14, 2000, Lisa K. Robinson, a Mental Retardation Residential Program Supervisor for CDMR since 1995 and employed since 1980 in various other capacities including as a MRW, was asked to investigate the incident for the Office of Protection and Advocacy of Persons with Disabilities ("OPAPD"). As a result of her investigation, Padilla was identified as the "alleged perpetrator" and placed off duty with pay. Robinson's report concluded that the injury was likely to have occurred at some point between 9 p.m. and 12 midnight on July 11, 2000 but that the cause of the client's injuries could not be established due to a lack of evidence. However, based on Padilla's admission that he had failed to conduct thirty-minute bed checks and visual checks as required by the Operational Directive from 9:30 p.m. to the end of his shift at mid-night, the report sub-

stantiated a finding of neglect against him. While Padilla admitted to the violation of the Operational Directive in his interview with Robinson,[1] he denied all knowledge of how the injury might have occurred.

Franks, a MRW at Pond View since 1981, with a disciplinary record of written reprimand for failure to report to work as scheduled on February 3, 1998, told Robinson what happened on July 12, 2000. She had entered the client's room at approximately 12:45 a.m. to take the client to the bathroom when she noticed the client's injuries, and then notified her supervisor and a nurse. She had been delayed because she "had gone to other girls bedroom first." Robinson Aff. (Def.'s Ex. 4) Ex. A, Franks Interview at 1.[2]

After receipt of Robinson's report on September 13, 2000, the OPAPD determined that no additional information was required and concurred in the finding and recommendations.[3] On October 25, 2000, Papale informed Padilla that he was being terminated effective October 28, 2000, based on his neglect in failing to check on the client on the night of July 11, 2000, and in consideration of Padilla's prior five day suspension twenty months earlier also for client neglect.

## II. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must draw all reasonable inferences in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Equal Protection Analysis

■ A claim under 42 U.S.C. § 1983 has "two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.1998); *see also Giordano v. City of New York*, 274

---

1. Padilla's second amended complaint also alleges: "The plaintiff acknowledged that he had not performed 30–minute bed checks after 9:30 p.m. on the night of the incident although such checks were supposed to be performed...." Sec. Am. Compl. [Doc. # 22] ¶ 9A.

2. Martin, the other CMDR employee whom plaintiff alleges violated work rules, had been a Supervising MRW at CMDR since 1996 and a MRW since 1987, had a clean disciplinary record, and had worked from 11 a.m. to 5 p.m. on July 11, 2000.

3. Robinson's report also made several "Programmatic/Administrative Recommenda-

tions," including reminding staff of their obligation to do the thirty-minute bed checks and walk-throughs at the change of shift, and to preserve physical evidence in cases of abuse/neglect of unknown origin, and recommending that the "Region" review staffing levels and/or supervisory monitoring. Robinson's unrebutted affidavit submitted in support of defendants' motion for summary judgment clarified that such recommendations are not "findings" and are made for consideration of CDMR without any requirement to act on them. An official review of Robinson's recommendations was conducted and it concluded that all were already fully implemented and no further action was warranted.

F.3d 740, 750 (2d Cir.2001).[4]

Here, Padilla pursues two equal protection theories: gender discrimination and selective enforcement. Padilla asserts he was discharged on account of his gender and not because of his violation of the Operational Directive because two of his female co-workers, Franks and Martin, also violated the Operational Directive yet suffered no adverse consequences for doing so. Padilla restates the same factual basis for his selective enforcement class of one claim under *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(per curiam).

### A. Gender Discrimination

 "An employee is denied her equal protection right to be free from gender discrimination when she is treated differently from other similarly situated employees, thus suffering 'disparate treatment because of gender.'" *Annis,* 136 F.3d at 245 (*quoting Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 144 (2d Cir.1993)). "In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, [the Second Circuit] borrow[s] the burden-shifting framework of Title VII claims." *Id.; see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[5]

 Under Title VII's familiar burden shifting framework, a plaintiff bears the initial burden of establishing a prima facie case of discriminatory discharge based on gender. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2nd Cir. 2000). If the plaintiff does so, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's dismissal. *See Graham v. Long Island Rail Road,* 230 F.3d 34, 38 (2d Cir.2000). If the employer provides such a reason, the plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock,* 224 F.3d at 42 (quotation omitted).

### B. Class of One

Pre-*Olech,* a selective enforcement claim based on the Equal Protection Clause in the Second Circuit required a plaintiff to demonstrate "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Giordano,* 274 F.3d at 750–51. The Second Circuit has declined to decide whether the second prong of a class of one selective enforcement claim continues after *Olech* to require a showing of such motivation or can be supported by evidence of irrational and wholly arbitrary conduct associated with

---

4. Defendants do not dispute that they acted under color of state law.

5. A plaintiff may, as here, bring a claim for employment discrimination under 42 U.S.C. § 1983 without concurrently pleading a violation of Title VII and satisfying the procedural requirements of that statute. *See Annis v. County of Westchester,* 36 F.3d 251 (2d Cir. 1994). While *Annis* did not consider the impact of the Civil Rights Act of 1991, the cir-

cuit courts that have done so to date have concluded that the act did not render Title VII and 42 U.S.C. § 1981 the exclusive remedies for public sector employment discrimination. *See Johnson v. City of Fort Lauderdale,* 148 F.3d 1228 (11th Cir.1998); *Beardsley v. Webb,* 30 F.3d 524 (4th Cir.1994); *see also Booth v. Maryland,* 327 F.3d 377, 381–83 (4th Cir. 2003); *Thigpen v. Bibb County,* 223 F.3d 1231, 1237–1239 (11th Cir.2000).

the intentional disparate treatment. *See Giordano,* 274 F.3d at 751; *Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 499–500 (2d Cir.2001); *see also DeMuria v. Hawkes,* 328 F.3d 704, 707 n. 2 (2003).

## IV. Title VII Analysis of Gender Discrimination Claim

### A. Prima Facie Case

"To meet the burden of production required for a *prima facie* case of discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of membership in the protected class." *Graham,* 230 F.3d at 38. "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Id.* at 39.

Defendants' motion challenges only the fourth element, maintaining that neither Franks nor Martin is similarly situated to Padilla. Defendants point out that Franks did not violate the thirty minute check policy but was simply fifteen minutes late performing the injured client's bed check because she had checked on other clients first, whereas Padilla failed to perform the required thirty minute bed checks at all for the last two and one half hours of his three hour shift. Defendants

observe that plaintiff offers no evidence that Martin failed to perform the required bed checks. *See* Mem. in Supp. [Doc. # 35] at 7–8; Def.'s 9(c)(1) Statement [Doc. # 36] ¶¶ 25, 26; Def.'s Reply [Doc. # 40] at 1–4. Plaintiff offers no evidence in rebuttal, and his sole response to defendants' challenge is his contention that the record shows Padilla and Franks both violated the Operational Directive's requirement of thirty minute bed checks by performing them late, and that Padilla was subsequently fired for his lateness whereas Franks suffered no disciplinary action at all. *See* Pl.'s Opp'n [Doc. # 38] at 4–5.[6]

The Second Circuit has articulated the 'similarly situated' standard for purposes of analysis of a prima facie case under Title VII:

> A plaintiff may raise . . . an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected class.
>
> .　　.　　.　　.　　.
>
> Whether two employees are similarly situated ordinarily presents a question of fact for the jury.
>
> .　　.　　.　　.　　.
>
> [The plaintiff must show he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself].
>
> .　　.　　.　　.　　.
>
> What constitutes all material respects . . . varies somewhat from case to case

---

6. Although plaintiff claims no constitutional violation related to his interim suspension with pay in his second amended complaint, he raises an argument that, because he was suspended with pay on July 19, 2000, six days prior to Robinson's having completed her investigative report, the finding of neglect entered on July 26, 2000, could not be the basis

for differentiating him from Franks. *See* Pl.'s Opp'n [Doc. # 38] at 5. Plaintiff's argument misses the mark since the inquiry on summary judgment is whether plaintiff has proffered sufficient evidence from which reasonable jurors could conclude that plaintiff's and Franks' conduct on July 11–12, 2000 was comparably severe.

and, as we recognized in *Norville v. Staten Island University Hospital,* [196 F.3d 89] (2d Cir.1999), must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness.... Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.

. . . . .

The determination that two acts are of comparable seriousness requires— in addition to the examination of the acts— an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham,* 230 F.3d at 39–40 (quotations and citations omitted). It is undisputed that plaintiff and Franks were subject to the same workplace standards. As to whether the conduct for which CDMR disciplined plaintiff was of comparable seriousness to Franks', the Court considers the context and circumstances of both plaintiff's and Franks' undisputed conduct. Even taking all inferences in plaintiff's favor, no jury could reasonably conclude that Franks was similarly situated to Padilla because plaintiff offers no evidence that Franks ever violated the Operational Directive. Instead, plaintiff re-characterizes his own admitted misconduct as only being late in performing his bed checks. This position simply has no support in the record—he failed to perform any bed checks for two and a half hours and completed his shift without one having been done since 9:30 p.m. As plaintiff offers no evidence that Franks failed to perform bed checks or to rebut her investigation statement ("I had gone to other girls bedroom first.") that her work with other clients caused her to be 15 minutes late to perform this client's bed check, she cannot be found by reasonable jurors to have failed to do bed checks. A conclusion that Franks' conduct is of comparable seriousness to Padilla's is thus precluded, particularly within the setting of providing care to retarded individuals who are unable to care for themselves.

■ Finally, Padilla's disciplinary record of client neglect, which Papale's termination letter stated was considered in the decision, reflects a fundamentally different record from Franks, both in nature of offense and degree of severity. Plaintiff had a five day suspension for client neglect in contrast to the sole blemish on Franks' nineteen year work record, which was a reprimand for failure to report to work one day, with no evidence of any impact on client welfare. Prior disciplinary problems may be sufficient to justify differential treatment of otherwise similarly situated employees. *See e.g., Graves v. Arkansas Dep't of Finance and Administration,* 229 F.3d 721, 724 (8th Cir.2000)(per curiam); *Sims v. Mulcahy,* 902 F.2d 524, 540–41 (7th Cir.1990); *Jackson v. Missouri Pacific Railroad Co.,* 803 F.2d 401, 406 (8th Cir.1986). Such rationale applies with greater force here where Franks and Padilla have not been shown to be otherwise similarly situated with respect to the severity of their respective actions.[7]

■ Finally, there is no evidence on which a reasonable jury could find Martin

---

**7.** Even if Padilla's prior record does not constitute plaintiff's evidence so that it should not be considered at the prima facie stage, *see Graham,* 230 F.3d at 41–42, it is unnecessary to the Court's conclusion that the conduct of Franks and Padilla cannot be found to be of comparable seriousness.

similarly situated to Padilla. While, even as a supervisory MRW, she is subject to the Operational Directive, nothing in the record shows that Martin failed to conduct required bed checks. In his deposition, Padilla did not know why he had asserted Martin was similarly situated, and his opposition to summary judgment adds no further basis.

## V. Class of One

As discussed above in relation to the deficiencies in Padilla's evidence supporting his claim of gender discrimination, plaintiff has come forward with no evidence from which rational jurors could conclude that Padilla was similarly situated to Franks or Martin and thus, as a matter of law, Padilla also cannot satisfy the first prong of his *Olech* claim.

## VI. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. # 34] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.